Mr. Goodsnyder, on behalf of the Plaintiff Apology Library, may it please the Court, good morning. Christopher M. Goodsnyder, Colonel Goodsnyder, on behalf of the Plaintiff Appellant, Roger Medema. Mr. Medema is present in court today, and we thank you for the opportunity to present oral arguments for your consideration of this appeal. Mr. Medema is a former Air Force and commercial airline pilot and an architect who resides in Lake Forest with his wife and two teenage children. On September 13, 2014, while on a recreational bicycle path a few miles from his home, Mr. Medema was traveling westbound across the Laurel Avenue Bridge in Lake Forest. The bridge is made out of... Mr. Medema is a former Air Force and commercial airline pilot and an architect who resides in Lake Forest with his wife and two teenage children. On September 13, 2014, while on a recreational bicycle path a few miles from his home, Mr. Medema was traveling westbound across the Laurel Avenue Bridge in Lake Forest. prior to Mr. Medema's accident, and that was really the focus of the analysis. You know, from our perspective, the 3105 was inapplicable from the outset because the weather conditions that day was dry. The asphalt pathways approaching the bridge were dry. There are three other bridges in Lake Forest that are assumed to be all exposed to the same weather. None of them had any history of accidents on them. None of them were wooden, though. Pardon? None of them were wooden. None of them were wooden, correct. So, in fact, after the... There was a subsequent... Two subsequent... Three subsequent accidents. Two in June of 2015 and one in October of 2016. And after the June 2015 accident, the fire chief, when they responded, they issued that very demonstrative request to the Public Works Department to act based on the hazardous condition. When the Public Works Department came out, they power washed the bridge, and then they subsequently installed warning signs that weren't present when Mr. Medema fell. So, when deposed, Mr. Carangelo, a Public Works official, said that he installed temporary warning signs after power washing because the bridge was slippery when wet. So, in essence, it's the wooden surface that absorbed water. It could be from any surface, from any source, including the power washing, that makes that bridge uniquely dangerous. So, is that also part of the argument as to why Section 105A, Wolf and Watten statute, doesn't apply? Because we're not just talking about a weather condition. We're talking about something inherently wrong with the bridge, which is part of the argument. Yes, yes. So, yeah, our position is that from the outset, there was a design problem. You know, there was, during discovery, we were tendered the blueprints for the plans. They're not stamped, and our professional engineer, Nicholas Hyatt, commented upon that. Now, in cross, Defense Council raised inferences or assumptions about whether they were likely, would have been stamped, or that there were some stamped plans somewhere. But the plans that were tendered to us throughout the discovery process didn't bear the stamp of an architect or a professional engineer, which, you know, calls into question the validity of the argument that the plan was adopted for the bridge. In addition to that, even under the 3103 theory, a local public entity is liable if after the execution of a plan or design, it appears from its use that it has created a condition that is not reasonably safe. So that's what we have in this case. If we get past the weather issue, we're talking about, as you say, the design flaw that made it undo the slip rate. What about the issue, there's also an issue, I believe, on the case of some kind of a notice. The city may have some right to claim immunization, but now if other people fall, so how does that impact this? Well, I would say on the notice front, what we have here is, again, the defendant asserts that because the prior accidents that were documented in tendered to us in discovery happened in 04, that there's some sort of implication that their length of time they can be forgiven if there aren't more accidents in there. You can see from the record that a great deal of the questioning that went on with the witnesses focused upon the nature of the tracking system that Lake Forks had. We have police, fire, and public works all have their own systems. Fire has two systems. They also swap systems during this period of time. The engineer, Mr. Magnus, who was once a city employee and became an employee at Bleck Engineering and did the inspections, was never provided with any of the accident history regarding the bridge. Even when he went out in 2016 and did it, there had been seven accidents at that point in time, and he wasn't provided with copies of any of those reports. So a lot of my analysis during the depositions focused upon the contention that, essentially, because there were only the three accidents, almost identical accidents in August of 04 and October of 04, we know from Mr. Kerr's affidavit that his group had accidents there. The only accidents that are reported, now this is for notice purposes, obviously the city only can be held responsible for a notice that they actually have it. But if you look at the testimony of the fire chief, Mr. Siebert, when he speaks to his reaction following the 2015, June 2015 accident, I'll read it. It's very, very poignant. He writes to Tony at Public Works, Tony, I'm not sure if this falls under your jurisdiction. We have had multiple bicycle accidents on the bridge at the very end of West Laurel Avenue today. I've had problems with this in the past. The bridge gets very slippery after a rain. We transported one gentleman to the hospital and someone from Open Lands, that's an affiliate, a non-city agency, transported a gentleman to the hospital. And someone from Open Lands gave someone a ride to the hospital, unbeknownst to us, after he fell. I went out there and put yellow caution tape to hopefully slow people down. But we really have to find a more permanent solution to make that bridge deck less of a hazard. The person I spoke to from Open Lands said it was not under their jurisdiction and that it is a property of the City of Lake Forest. So I'm hoping you can help me out and direct me to the right person to possibly come up with a solution to fix this hazardous situation. Let me ask a question related to that. Obviously, it appears to be undisputed that there were prior accidents on this bridge. You've alluded to the city is going to point to the fact there was a substantial gap in their opinion between the prior accidents and the accident in this case. Were you able to unearth any cases that address the impact of this alleged gap? I haven't found any cases, and they weren't any cited by the defendant either. They make an assertion and counsel in their briefs. They usually refer to the phrase, you know, tenure, lag. I don't think there's nothing. What we do know is that they didn't do anything to change the bridge deck from the entire period of time from its installation on. They had problems when the police went out to respond to the accident. The accidents in 04, they put temporary signs out there. We know that they weren't there because at the time of Mr. Vadim's accident, there's no debate. Mr. Vadim testified there weren't warning signs there. We don't know how long they were up. We don't know how long they were up. We just know they were temporary. And we know that Mr. Siebert put out temporary signs after the 15 accident, put caution tape up, and then the public works did it when they power washed. So what we do have is essentially the bridge being installed in 87, and then you have a series of accidents. Again, you also have the contact. You would agree, though, that the only accidents in the record that the city would have been on notice of before your client fell was in 04? Yes. Well, I would concede that the only records that they produced to us were the 304 accidents. Again, we went through a great discussion about what information would have been provided. And just to follow up on the email with regard to Mr. Siebert, now Mr. Siebert said when I cross-examined him about what he was referring back to about prior accidents, he said to me, he said at his deposition that he was referring back to the 04 accidents, but the documents that were produced in discovery don't list him as a responder to any of those 304 accidents. So, you know, I think it's causing the question, you know, at trial whether he's referring to other accidents besides, you know, he's emphatic in this term that has to be responded to. This was actually, I believe, taken care of over the weekend and resolved like on a Monday or Tuesday. So the fire chief of Lake Forest refers to this as a multiple, twice he calls it a hazardous situation and refers to it as needing an immediate and a permanent solution. So their attempt at putting the temporary signage obviously wasn't an effective remedy. The other issue that, again, either it's kind of mischaracterized. Our position about if you look at the photographs that were attached to the city's response brief, there's three of the photographs that depict A9, A12, and A22 that best depict the position of the old growth tree directly at the end. As the westbound bicyclist, as Mr. Medina was, come to this point in time, you have to make a very sharp right turn to go to prepare to go around that. And that's why. With respect to that. Yes, sir.  Well, I would say it's the, you can't have your key committed to from the city's perspective. If you are going to say that they did nothing to act to correct this position, they didn't put up warning signs about it. You have what Mr. Medina testified to was he slowed down, he was using caution. What he said was he didn't anticipate it being as slippery as it was. What happens is you get to this point, you have to shift your weight to make that sharp right turn. And at that point in time, you lose your balance. So, you know, you can travel across the asphalt pass. We have the three other bridges in Lake Forest. You have two concretes and an asphalt bridge that had no history of accidents that are all exposed to the same weather. So you have a unique feature, which is when they decided the placement of this bridge across the river, and they, in deference to the existence of this beautiful, I guess, oak tree, they decided to put it right there. You can see from the path and the approach on both sides, they had to curve to get to this point. They selected this point, but as our professional engineer, Mr. Hyatt, said, they didn't leave enough room for a gradual turn that a bicyclist should have to make. So I think they can have their key committed to on the open and obvious thing. If it rose to that level, you have the case, I'm at a loss for the site, but where the person leans against a plate glass window and it fails, and they said essentially that type of risk wasn't sufficient to put someone on notice of it. So here, Mr. Medina used due care to approach the bridge. He didn't envision it being as slippery as it was. When he shifts his weight, you have the fall. So really, the focus of the analysis, from our perspective, is that they had an opportunity to install warning signs. They had an in-house sign-making system. Subsequently, the total cost was less than $200 to install the slippery, wet, and curve-ahead signs. They had an opportunity to install a very low-price additive to the deck surface that was available back when the bridge was originally made. They had selected other bridge surfaces for other bridges that didn't have problems throughout Lake Forest. They could have tasked their engineer with focusing on the safety to the bicyclists instead of just the structural integrity. If you look at the reports that are all part of the record, he was commenting about water flow underneath and the steel structure, the superstructure of the bridge, and almost cursory talks about the bridge surface does no measurements whatsoever about the slip resistance to it. And that's the safety feature that we're talking about here, using bicyclists and pedestrians crossing the bridge. He was never provided, Mr. Magnus was never provided with copies of the action reports to allow him to gauge that aspect of the safety of the operation. Did you ever allege in your complaint on the Wolfhorn Latin Count the placement of the bridge was a Wolfhorn Latin act in relation to their tree? Well, I wouldn't say in and of itself it's more of a condition, but it explains why the accents are at that end of the bridge. The defect you allege is the unduly slippery. Unduly slippery, the condition of the wood, what you have is the forces at play at that location. So when you have bicyclists who have to make that sharp turn where if they were going straight ahead they wouldn't have an issue with it. So it's at the western exit of the bridge that you have this surface that they've selected and they don't put any skin-resistant surface on it. They don't put asphalt coating on it or apply a slip-resistant paint, all that were readily available back then or could have been added after the fact. In fact, if we are to prevail in our appeal and we're remanded, we intend to address the fact that subsequently they have addressed that issue with the coating on the bridge, so that will be addressed there. You do agree that 106 applies to this situation? Absolutely. It's an operational path. We don't contest that? We don't contest that. Nope. Dismissal of L1. Nope. And just to address that point, the reason we're faulted for having pled that, one, we had black engineering and we also had, if I could just finish the thought. Go ahead. A tort immediately acts as an affirmative offense and has to be pled or it's waived. So we certainly were within our rights to plead it as an evidence count and a willful lotton count. Thank you very much for your time, Your Honor. Thank you, Mr. Fitzschneider. Mr. Yambert, you may proceed on behalf of the appellee sitting. I'm sorry? You may proceed on behalf of the appellee sitting. Oh, thank you. I take it you're here for the sitting, right? I am. I just couldn't hear you. If I just heard what happened there, there's a concession that 3-106 has gone away. They agreed that it applies in willful and wanton. I didn't quite understand that interplay that you had with counsel. The interplay was I was asking whether 3-106 applied to this situation, which he agreed it does because it's a recreational path. Okay. And that he agreed that the dismissal, based upon your trial, from the defense of 106 to Cal-1 was proper. The negligence has gone. Right. Okay. All right. All right. To address a question that Justice Burkett had, why isn't this open and obvious? I don't usually do this, but I'm going to, and I didn't agree, but I'm going to do it again. Give me your best estimate in miles per hour as to how fast you're going. Answer? Probably about five miles an hour. Question? Sir, you're going slow. Answer? I was going slow because the bridge still occurred to be wet. It was a precautionary measure. Here's my rhetorical question for you. Buccellaris v. Chicago Park District, 171 Illinois 2nd, 435. Why doesn't that apply? In all seriousness. Well, I think the argument would be on the other side that it's unduly slippery, that it's – he also testified in that deposition, being the plaintiff, that it felt like he was going on wet ice. Right. So, I mean, that wouldn't be open and obvious. To me, riding a bike across a bridge that's wet might be open and obvious. It might be slippery, but it might not be absolutely obvious to me that it would be like riding on wet ice. Okay. And this gets to what Justice Hudson asked when he said, well, what about 3-105? And you're making a complaint that alleges that there's something else besides weather. And counsel, of course, says yes. No. Look at what 3-105 says. It says the effect of weather on those types of things. But if you look at Enriquez and the trial court cited Enriquez, which is a 105 case, I believe, Enriquez actually said that the plaintiff in that case didn't plead any type of a defect in the bridge, whereas here the plaintiff has pled a defect in the bridge, that the bridge material is unduly slippery. Okay. Good enough. I understand what you're saying. But look at what this is saying, the actual immunity. The immunity says the effect of weather conditions as such on the use of. It's a rhetorical question. If it hadn't been slippery and the accidents in 2004 were also in rain, would there be an accident? Let me ask you this then. So if I own a bridge, whether I'm a city or whatever, and I'm allowing people to go across the bridge, and I know people are going to be going across the bridge on bikes and walking and everything, and it is made of a substance that when it is dry, I know that it's perfectly fine. But when it gets a drop of water, no matter from where, that I know it's like an ice skater. All right? And I know this. And I know this. Are you telling me that if that drop of rain comes from an artificial source, I have no immunity, but if a drop of rain hits that bridge, then I'm immune because it's rain. I understand that if you have the unusual situation of a drop of rain causing something to become unduly slippery, perhaps you would have to modify the rule or the immunity. I get that point. But this isn't an unusual circumstance. This is a wooden bridge that's wet. The plaintiff, introduced as an architect, knows it's wet. Now, that's open and obvious, and that comes right into the torque immunity. One other thing I want to bring is about 3105. We did a motion to strike the brief, and you folks have said you're taking up our motion to strike the waiver argument along with this oral argument today. And, you know, in the reply brief on page one and three of the reply brief, when they said that Justice Dianne or Judge Dianne Winter didn't base her decision in part. Now, I understand she said this case turns on, but then she gave other reasons for granting the motion for summary judgment. She said that early on. She said this case turns on to willful and wanton conduct, which I also want to address with you before we get through. Enriquez, she actually points out Enriquez. In pages eight and nine of that argument, a report receives, Rebecca Fozo was arguing Enriquez. And on page 45, she says, and I find the facts that we have for this accident pale in comparison to the Enriquez case where there were bridge tenders in place for the very purpose of clearing snow and ice. And when you read that case, you see that they actually had their own internal City of Chicago regulations that they're supposed to be out there and clearing the ice and snow. And she said, so I would grant the motion on that ground that it doesn't rise to willful and wanton and the 3105A. So there's our motion to strike that. Let's talk about 3105A. So I think it's important for us to keep in mind that this case comes to us on a grant of summary judgment. Correct. And you know that a grant of summary judgment means there is no trial or issue of fact. There's also the body of law that says, and I quote, the question of willful and wanton conduct is generally a question of fact for the jury. The question rarely should be ruled on as a matter of law. That's Roe Blakes versus the City of Chicago. Sure. So we're hearing things about the condition of the bridge, how the moisture got on there. You've even heard earlier speaking of a gap, which certainly you can make a legitimate argument on. Okay. But do we know whether the gap was because the bridge had been accident-free, the signs blew down? I mean, why aren't these, even the time gap, questions of fact for the jury to decide? Because it is a willful and wanton standard, and if you really want to say that just by alleging that something is willful and wanton, when it doesn't rise to the type of conduct that is in most of the cases that interpret willful and wanton conduct. Is that really a question of law? Your argument is that this has to be a question of law. The definition is illegal, what is willful and wanton. Let me, I want to go over this because this is important to me, and I actually made, this is the second time that I'm trying to get this appellate court to tackle willful and wanton. So let me have a minute here. Willful and wanton conduct means a course of action which shows an actual or deliberate intention to cause harm. That's a thought process. Or which, if not intentional, shows utter indifference to a conscious disregard for the safety of others. That also is part of a thought process. It's beyond negligence. And as we know from the Burke v. Rothschild litigants case, the Supreme Court has gone into what is willful and wanton. I propose this. Now, I know I can't change the rules, and that's in the Tort Amnesty Act, and it's in the Burke v. Rothschild case. But this court needs to take a look at what those words really mean, and I propose this. Utter indifference to or conscious disregard for the safety of others means an active thought process. After recognizing a known and probable likelihood of a significant bodily injury and consciously disregarding that known and probable likelihood of a significant bodily injury, that's really what the courts have been saying when they come to what is willful and wanton conduct and what's the distinction between that. Did the Winfrey case use that definition? No. That's my definition that I'm asking about. No, no, but I got it.  What Winfrey said, Winfrey v. Chicago Park District, said that simply labeling conduct, negligent conduct as willful and wanton, doesn't make it. You have to go beyond that to allege it. Right, and in that vein, they said a public entity may be willful and wanton if it has been informed of a dangerous condition or knew others had been injured because of the condition. Absolutely, absolutely. Now we have the 10-year gap. 2004, you knew about it. You knew someone was injured in 2004. We didn't know that somebody was injured. We knew that there was an accident. I don't know the severity. I can't answer that question intelligently. But, yes, I think we're referring to 2004. I don't know. Maybe I'm thinking of mixing it up with a different report, but I thought in that report that people were taken by ambulance. They could have been. So you have two people slipping in 2004. Now you're 10 years later. In 2004, they put up temporary signs that apparently there's evidence that they were down when the plane fell. Correct. So how is that at least a tribal question of fact on willful and wanton based upon the prior evidence? The willful and wanton aspect of it is, in part, Your Honor, the passage of time. Let me ask you a rhetorical question. And I know that it's hard to get fast and steady rules. But when you haven't had an accident that's been reported to the city in 10 years or a similar accident, and I want you to look at this from the city's perspective. A heavy rain, that was what it was, a heavy rain, and two bicyclists go down on a bridge. Ten years passed, and that was a heavy rain. Ten years passed, and then we have this accident by the plaintiff in this case, and he doesn't report it to the city either, by the way, until there's a lawsuit filed. Ten years passed. Look at what willful and wanton says, the definition of it. I don't think that meets the willful and wanton. Well, shouldn't you be making that argument? I'm listening to this, and it sounds like you should be making that argument to a jury. As I ask Mr. Goodstein, do you have any cases that stand for the proposition that as a matter of law, a 10-year gap precludes a finding of willful and wanton? No. Well, then why isn't that an issue of tribal fact? Why does a judge get to decide that it cannot be willful and wanton? I mean, and again, when you look at the circumstances of it, are we going to – I guess I'm going to come at you from a different angle, and I'm going to try to be responsive to your question. I'm not trying to dodge your question. The justices decide the law, and not everything is a question of fact. Your argument is that based upon what we know, there is no set of facts that could establish willful and wanton here because 10 years is 10 years, and those first two accidents, the city would have been immune from anyway under 105, and they removed the signs because there were no more accidents. So your argument is that could not, as a matter of law, not a question of fact, but as a matter of law, constitute willful and wanton. That is correct. And otherwise, you might as well just throw out willful and wanton. I didn't see it. Tell me, do you have any cases where, in Illinois, where a public entity was put on notice of a prior accident, injury that was allegedly caused by a defect, no matter, I don't know, 10 years, 15 years, two years, whatever, where some adjustment was granted to the city, where they actually had actual notice of people being injured by that alleged condition? Do you cite Ozuck, Pamaro, Rooney? The cases of people running across crumbling asphalt, that type of thing? Yes. The answer is I don't have a specific case for you. Because those cases that you cited aren't really, I mean, they're good for propositions of law, but factually they're not really. Well, and one thing those cases do, I understand that the facts are different in this case, but one thing those cases do do is address your concern of willful and wanton. Those cases are granting motions for summary judgment on the basis of the willful and wanton standard and find that those things are not willful and wanton. So that is a decision that is made as a matter of law at times, and this one would be appropriate, especially when the argument's been weighed by the appellant. But that's beside the point for that part of the argument. But I really would like to get back to this, what the rule on willful and wanton conduct should be. Because when you look at what the courts are telling you, they're telling you that utter indifference to unconscious disregard, let's forget intentional, it's not intentional. But that's what throws counsel and the courts into a lot of extra paperwork, because no one has really wrestled with what those words mean or the definition of it. And I'm thrown out. Utter indifference to or conscious disregard for the safety of others means an active thought process that takes it out of the hands of negligence after recognizing a known and probable likelihood of a significant bodily injury and consciously disregarding that known and probable likelihood of significant bodily injury. Mr. Yammer, where are you quoting from? Pardon? What are you quoting? I'm not. I'm proposing a rule. That's something that I propose. Well, how do we adopt a rule that's not in the case law? I think that I'm asking the court, when you're wrestling with this willful and wanton standard, it needs to be defined and you need to give more guidance to the people down the trenches on this issue. This is what's happening on a daily basis to me. You have weather-conditioned cases, 3-105A weather-conditioned cases, where there is no willful and wanton exception. And this is happening every time I get a 3-102 case or slip and fall on a sidewalk or something like that, where the courts, where the actual immunity itself says that you have a duty to keep your property in a condition for people that are intent to use it, there's no willful and wanton in there. Whenever I get a case now, and I don't know whether it was a bit-less seminar where they told everybody to do this, there's count one, negligence, and there's count two, willful and wanton, where the allegations, which are almost the same in the complaint that I'm dealing with in this case, are identical in count two for willful and wanton as they are in count one. There's no expansion on it. It violates Winfrey v. Chicago Park District right there when they do that. But we have to sit there and go, and it's like, why are you even doing this? There is no willful and wanton exception to this, so why are we pleading this? And it's a whole different cause of action. It's because people don't understand what willful and wanton is, where it comes into the TOR Community Act, and they don't understand that there is a difference on it, and that the courts can and often have decided this issue as a matter of law. Maybe they actually understand that willful and wanton, that immunity is an affirmative defense, and that's the what? Yes, but they're pleading willful and wanton in areas of the TOR Community Act where there is no willful and wanton exception. Okay, I mean, you're assuming, as I'm sitting down as a place attorney and I'm writing out a complaint, I'm assuming, okay, a really good city attorney is going to get this, and they're going to go with a 105 instead of a 106, so I better not put in the willful and wanton. No, they're going to throw in the kitchen sink because that avoids malpractice. And you guys cite your affirmative defenses, and we'll find out later. Okay. I'm hoping that we can give guidance so that people won't throw in the kitchen sink and avoid all these controversies that we have over willful and wanton, especially when it doesn't even do anything to the plaintiff's cause of action. But more so, I'm asking this court to look at what willful and wanton means. Under the current definition, it's heightened above and beyond negligence. It has to be, sure. Sure. All right, so that gets back to my question. Keep in mind your time has expired, so if you want to wrap up, finish your thought. My final thought is, Justice Burke, you have ten years after an accident where somebody was injured in a rainstorm. Ten years. Look at all those cases that you refer to, which are factually different, the school district cases and so forth and so on. They're granting motions for summary judgment on a willful and wanton standard. It's not always a question of fact. And the problem that we're having, and I ask you, if you look at Winfrey v. Chicago, you look at count one of the current complaint and you look at count two of the current complaint. Where does that, the allegations, rise above ordinary negligence? And the last thing I want to say on that is, when we're talking about the tree and the curve and everything like that, at least let's talk about it in the deposition or let's plead it. It's not in the complaint. Judge Wehr granted this in part under 3105A, and that argument's been waived. Thank you very much. Thank you, Mr. Youngberg. Chief Judge Snyder, you may address the court in rebuttal. Thank you. Thank you. To address a few points, the three accidents that occurred in 2004, the accident reports are part of the record that were exhibited to the deposition, and they all indicate that the people that the fire and police department from Link Forest was responding to were all transported to the hospital. So the implication that they were somehow not severe accidents and therefore they don't register on the Link Forest radar is inaccurate. And in the reports themselves, there's no reference that it was ongoing rain as counsel attempted to portray the prior accidents as during the rain. They were responding to bicyclists who fell at the same bridge. Again, there's no evidence that there were any other accidents at the three other bridges in this entire period of time. And as I discussed before, there was nothing done to correct or remedy the bridge situation during the entire evolution of the bridge. I think Your Honors were accurate in highlighting the distinction, the evolution of the concept of local ones. So in Zaccaro v. Suli in 161, Illinois 2nd, 267, the Illinois Supreme Court liberalized the Burke standard for willful and wanton conduct. In Burke, the Supreme Court found that there was a qualitative difference between negligent acts and willful and wanton conduct. However, the Zaccaro court created a sliding scale approach to determining willful and wanton conduct. This is because the court found that willful and wanton conduct is a hybrid of negligent acts and intentional tortious acts. The Illinois courts have recognized that acts that are willful and wanton also share many characteristics with ordinary negligent acts. Well, they may, but they generally consider it to go well beyond ordinary negligence, is it not? They go on to say that the conduct... Can you answer the question? Repeat it, Your Honor. That notwithstanding, it's pretty clear that willful and wanton is a higher standard than ordinary negligence. I concede that absolutely. They're not one and the same, obviously. I concede that absolutely. The court concluded that it's just... The court said willful and wanton conduct may be just one degree more than negligence, which, contrary to counsel's argument that the court should redefine the law on counsel's standard to avoid... make it easier for defendants to get out of cases earlier on, Illinois public courts have determined that because willful and wanton conduct is an aggravated form of negligence, the plaintiff must first plead negligence. That's Papadopoulos v. Fitness 19. Then the plaintiff must plead the heightened state of mind for willful and wanton conduct. Counsel refers to my complaint, and he says that essentially there's no difference between the two counts. Paragraph 16 of Count 2 says, Lake Forest owed Medina a duty to not act with deliberate indifference or not to willfully or wantonly or with reckless disregard for safety due to the acts. Then I redefined each of the actions and failures that the city did in failing to remedy a known defect and warn of the defect. Can you address the argument that you've forfeited your 3105A argument? Well, you know, to be fair, the court identified that in Judge Winter's analysis, you know, it's a 45-page-plus record on court proceedings. The clear focus of her analysis was on the notice issue and whether it rose to the sufficiency of the willful and wanton. To be frank, in her closing comments, she doesn't even refer to it as the weather issue. She only refers to it by the section number. The issue was fully briefed before Judge Winter, was fully argued before Judge Winter, and the city devoted probably a third of their response brief to the issue. They certainly weren't prejudiced in any way by the issue. They also addressed in their brief other issues, the open and obvious, which wasn't relied upon by the court. So there's absolutely no prejudice to the court. You read from the language of their motion to strike, you know, with exclamation points This court can decide the basis. Anything that's in the record, you can affirm or reverse. Clearly, it's well-established. The legal issue about the applicability of 13105 is properly before the court. There's no prejudice to the defendant. It's been fully addressed in their response brief. It didn't just appear in the reply. It's just I addressed it and I responded to it. So I don't believe that the court has discretion whether or not to find a waiver of forfeiture, and I'm respectfully requesting that the court address the substance of the issues and that we're fully briefed and turn to the merits of the case. Thank you very much for your time, Your Honors. I appreciate it very much. Thank you, Mr. Kristine. Thank you. I'd like to thank both counsel on all sides for the quality of their arguments here this morning. The matter will, if necessary, be taken under advisement in a written decision or issue in due course.